IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES R. MALLES                 :        CIVIL ACTION
                                :
        v.                      :
                                :
LEHIGH COUNTY, et al.           :        NO. 06-4024

MEMORANDUM

Dalzell, J.                                      July 27, 2009

        James Malles sues Lehigh County and PrimeCare Medical, Inc.

("PrimeCare")[1] pursuant to 42 U.S.C. § 1983 for allegedly

violating his Eighth Amendment rights while he was an inmate at

Lehigh County Prison.  Malles claims that he contracted

Methicillin Resistant Staphylococcus Aureus ("MRSA") while he was

incarcerated there and that the defendants unconstitutionally

failed (1) to provide him timely, adequate medical care and

(2) to protect him from getting infected.  He also sues PrimeCare

for negligence under state law.

        The defendants filed motions for summary judgment, and

Malles responded to both motions.  For the reasons we discuss at

_____

        [1]  On July 8, 2008, we approved the parties'
stipulation to dismiss defendant Josie Bahnick, and on January 6,
2009 we approved the parties' stipulation to dismiss defendants
Dale Meisel, Warden of Lehigh County Prison, and Nancy
Afflerbach, the Deputy Warden of Treatment.  Plaintiff has also
agreed to dismiss his claims against the Lehigh County Department
of Corrections because it is not a separate judicial entity from
defendant Lehigh County.

length below, we will grant summary judgment regarding Malles's §
1983 claims and decline to exercise supplemental jurisdiction
over the remaining state law claim.

I.   **Factual Background**

   A.   **Plaintiff's History**

   Plaintiff James Malles was born on July 30, 1949 and
graduated from Overbrook High School in Philadelphia. Malles Dep.
at 5-6. After high school he worked at a variety of jobs,
including assisting in a photographer's studio in Philadelphia
and working at a car wash and bakery in Florida. Id. at 6-8. He
went to the emergency room once in Florida because his arms
popped out of joint.[2] Id. at 30. He returned to Pennsylvania to
care for his ailing mother, who died in 1988 or 1989.  Id. at 8-
10.

   From 1989 to 1999 Malles served a ten-year sentence at SCI-
Graterford for sexual assaults that occurred in Florida and
Pennsylvania. Id. at 10-13. During his time in custody, Malles

---

   [2] One physician involved in treating this injury
suggested that he put a "nut and bolt" in Malles. Malles Dep. at
31. Malles told him that "if God wanted me to be a robot, he
would have made me to be a robot." Id. Under the advice of
another doctor, Malles was able to recover from this injury
through exercise. Id.

was treated for gastroesophageal reflux, and he has taken Zantac
to treat those symptoms. Malles Dep. at 33. After Malles was
released, he worked in warehouses through a staffing or
employment agency in Allentown. Id. at 14. During that period he
suffered two hernias, for which he had surgeries. Id. at 15-17,
36-37. Malles then moved into a hotel, where he also worked part-
time. Id. at 19-20. He was taken to the hospital during this time
with chest pains, but it turned out to be "gas building up around
[his] chest." Id. at 33-35.

Malles was again arrested in 2005 for sexual assault. Id. at
20, 22. He pled guilty and received a sentence of ten to forty
years. Id. at 23, 38. Malles was held at Lehigh County Prison
from the day of his arrest, April 30, 2005, through December 1,
2006. Id. at 24, 38. He was transferred to Graterford and then to
Camp Hill. Id. at 24-25. He is currently held at Albion. Id.

**B.   Inmates' Medical Care at Lehigh County Prison**

At Lehigh County Prison ("Prison"), PrimeCare is responsible
for the inmates' medical care, and Nancy Afflerbach, the Deputy
Warden of Treatment, was the liaison between PrimeCare and the
Prison. Afflerbach Dep. at 29, 75. To request medical care from
PrimeCare, inmates at the Prison would fill out a "sick call

3

slip." Id. at 73. PrimeCare nurses also visit the inmates three times each day to deliver medications, and, according to PrimeCare, these nurses may -- but are not required to -- have slips with them. Haskins Dep. at 79; Bahnick Dep. at 20. Usually, when inmates ask these medication nurses for medical advice, the nurses tell them to fill out a slip. Haskins Dep. at 79. PrimeCare believes that correctional officers also have the slips, but PrimeCare will consider any request from an inmate, even if it is not on a slip. Id. at 80 ("An inmate can write a request literally on a piece of toilet paper and place it in a sick call box. And we would have to respond to it."). See also Bahnick Dep. at 20. But is not sufficient for inmates to simply make an oral request to the medication nurses. Haskins Dep. at 80. According to Malles, inmates were "lucky" to get sick call slips, which were not readily available.[3]  Malles Dep. at 73.

---

[3] We discuss Malles's difficulties in accessing the sick call slips below. Warden Meisel said that he did not receive any complaints about the lack of sick call slips, Meisel Dep. at 56, but, according to him, inmates could have made such complaints to the corrections officers or floor sergeant. Id. Bahnick was also unaware of any complaints that PrimeCare nurses did not have sick call slips. Bahnick Dep. at 21.

C.    **MRSA at Lehigh County Prison**

MRSA is an infection that is resistant to methicillin, which PrimeCare Health Services Administrator Josephine Bahnick characterized as "one of the stronger antibiotics." Bahnick Dep. at 22. One can contract MRSA from poor personal hygiene or by sharing gym equipment, toilet facilities, or soap. Id. at 22-23. Some people with skin conditions, such as boils or skin eruptions, are more prone to getting MRSA. Id. at 25.

Afflerbach knew that a female inmate with MRSA had come to the Prison in 2003, and there was a meeting between Prison officials and PrimeCare in February of 2004 to discuss changes that they were considering at the Prison in response to MRSA. Afflerbach Dep. at 50-51, 63-64. Beginning in at least 2004, Warden Meisel was aware that MRSA could spread from one person to another. Meisel Dep. at 19, 31. He believes that MRSA is a "problem" and that suppressing MRSA and other diseases, such as hepatitis C or scabies, is "an issue." Id. at 30. Meisel reviews information about MRSA outbreaks at the Prison on a quarterly basis. Id. at 28. PrimeCare Vice-President Todd Haskins said that the Prison had "an established protocol for treatment in dealing with" MRSA when PrimeCare took over the healthcare services

contract at the Prison in the fall of 2004, but he could not name any specific procedures. Haskins Dep. at 41.

PrimeCare and the Prison did establish a process for addressing MRSA infections. Inmates who possibly have MRSA are tested for the infection and placed in medical isolation while the prison waits for lab results. Bahnick Dep. at 42. After the lab results come in, an infected inmate stays in isolation until any wounds are closed, and he takes an antibiotic to which his particular strain of MRSA will respond.[4] Id. at 42-43. Bahnick receives information about MRSA infections from PrimeCare and makes monthly reports to the Quality Assurance Committee -- which is comprised of Bahnick, the Nursing Supervisor, the Warden, and Afflerbach. Id. at 53-54. But when one inmate is infected with MRSA, PrimeCare does not usually notify other inmates. Id. at 55.

The defendants also took some steps to try to prevent MRSA infections. Prison staff began receiving a handout about MRSA in February of 2004.[5] Meisel Dep. at 32. That year, the Prison also

---

[4] The lab report identifies antibiotics to which an inmate's particular strain of MRSA is sensitive. Bahnick Dep. at 44. See BioReference Laboratories Reports for James Malles, October 10 and 14, 2005, Lehigh County Ex. B ("BioReference Lab Reports").

[5] Meisel said that inmates began receiving information
(continued...)

eliminated inmates' use of wash-cloths. Id. at 20. Every time
PrimeCare inspected the laundry facilities at the Prison, the
water temperature was at the appropriate level. Bahnick Dep. at
63-64. There is no evidence to support Malles's claim that the
Prison was cited for health violations.[6]  In 2004, the Prison
also switched to antimicrobial or antibacterial soaps for
inmates' personal use, and inmates in medical isolation used a
Hypacleanse or Dial soap that was not mandated for the rest of
the population. Afflerbach Dep. at 65, 68, 85; Bahnick Dep. at
38-40. The Prison also implemented other changes in medical
isolation that it did not put into place for the general
population. Afflerbach Dep. at 83. For example, Afflerbach knows
that since 2004 they have used a chlorine bleach cleaning
solution for the cells of inmates in medical isolation and have
since then implemented that for the general prison population.
Id. at 83-84.

_____

[5] (...continued)
about MRSA in 2006 or 2007, but he was not sure if the inmates
got this information in 2005. Meisel Dep. at 23, 32. Indeed,
Malles says he did not receive any information about MRSA in
2005. Malles Dep. at 41-42.

        [6]  The only evidence Malles offered to support this
point is that he saw a "guy who came around [the Prison] showing
a badge." Malles Dep. at 117.

On June 20, 2005, PrimeCare distributed a "Policy Review
Update" to a number of people, including Health Services
Administrators and "All Contract Sites." Memo from Francis J.
Komykoski to Junior Vice Presidents, et al., June 20, 2005, Pl.'s
Ex. I. This document included a policy titled "MRSA Infection
Control Measures," which explained what MRSA is, how people
contract it, how to identify it, and other basic information.
See MRSA Infection Control Measures, Pl.'s Ex. I ("Control
Measures"). The Control Measures included a list of activities
and procedures for "[s]uccessful management" of MRSA, such as
discussing prevention with all new inmates, posting a fact sheet
for inmates about MRSA, teaching good hygienic practices
"including access to showers," review of a MRSA fact sheet by
medical staff, assuring "prompt access to medical care for all
skin complaints,"[7] and frequent changing of laundry and "adequate
environmental cleaning." Id. at 5. The policy also directed
PrimeCare staff to, among other things, encourage inmates to
report skin lesions, "[c]ulture if possible all skin infections
upon presentation," evaluate those whose cellmates have MRSA and

---

[7] According to PrimeCare, "prompt access" to medical
care for skin complaints is within twenty-four hours. Haskins
Dep. at 77.

8

others who may have close contact with them, and isolate inmates suspected of having MRSA. Id. at 5-6. Inmates with suspected or diagnosed MRSA were to shower daily, and the shower was thereafter to be cleaned with a bleach solution. Id. at 7. Cells of infected inmates were also to be cleaned with the bleach solution. Id. at 7.

As described above, PrimeCare issued the Control Measures during Malles's time at the Prison, and some -- but by no means all -- of these recommendations were put into place while Malles was jailed there.

### D.   MRSA Infection Rates and Statistics

Afflerbach began compiling information about MRSA at the Prison in 2004 and started creating quarterly statistical reports by at least 2005. Afflerbach Dep. at 100-101, 112. She gave these reports to the Director of Corrections, the Warden, and PrimeCare's Healthcare Administrator. Id. at 111. Those who attended quarterly meetings between representatives of PrimeCare and Lehigh County Prison also discussed these statistics, as well as a wide variety of other topics. Haskins Dep. at 27-28, 99-100.

According to Afflerbach's statistics, fifty men at the
Prison tested positive for MRSA in 2005.[8]  Statistics at 1.
Bahnick characterized this as a "significant" number of cases,
but said it did not constitute an epidemic. Bahnick Dep. at 82.
Five of the men who were infected in 2005 were from Malles's
housing unit, 1C2. Statistics at 1; Malles Dep. at 55. The number
of male inmates who contracted MRSA more than doubled between the
second and third quarters of 2005, from eight inmates to
eighteen.[9] See Statistics at 7, 14. There were no new infections
in Malles's unit, 1C2, in the second quarter of 2005, four new
infections in the third quarter, and one new infection --
Malles's -- in the fourth quarter. Id. at 2, 7, 14. There is no
evidence that Lehigh County took any additional educational or
precautionary measures during that time to combat the spread of
MRSA within the Prison. See Bahnick Dep. at 84.

_____

[8] One of these men was from Chester County and another
was from a different facility, MCCC, so in 2005 there were 48
males who were inmates at the Prison who were infected with MRSA.
See Statistics at 1.  The record does not disclose the total
average inmate population in 2005.

[9] In explaining his review of the infection rates,
Haskins could not articulate what he would consider to be a
"spike" in the infection rate, but he did say that a "doubling of
incidents" would "get [their] attention." Haskins Dep. at 100.

**E.   <u>Malles's Housing Assignments and Hygiene at the Prison</u>**

When Malles arrived at the Prison in April of 2005, he participated in a medical intake process during which medical staff reviewed his health history. Malles Dep. at 39-40. He did not receive any information about MRSA.[10] <u>Id.</u> at 42. For three or four days he was held in the receiving block, where he was in a cell by himself. <u>Id.</u> at 46-47. During this brief time, he tried to take at least one shower a day. <u>Id.</u> at 48. In fact, at the Prison there was no limit on the number of showers that he could take. <u>Id.</u> at 49. Malles was then assigned to a unit where he stayed for no more than an hour. <u>Id.</u> at 49-51. He was harassed by other inmates and "told" the officer to transfer him elsewhere. <u>Id.</u> at 51. The prison charged him with misconduct for "uprooting the running of a pod", and put him in disciplinary segregation where he was alone in a cell for seven days. <u>Id.</u> at 54, 58.

After he left segregation, Malles went to the 1C2 unit, where he remained until he later entered medical isolation. <u>Id.</u> at 55, 58-59. In 1C2, Malles occasionally had cellmates, but he

---

[10] Malles was brought back to Lehigh County for a post-conviction hearing in 2007. At that time, he received information about MRSA that advised him to "wash [his] hands and stuff like that." Malles Dep. at 41-42. But he did not receive this information when he was at Lehigh County Prison the first time in 2005. <u>Id.</u>

does not remember their names. Id. at 59, 62. He never shared
soap, toothbrushes, clothing, or towels with his cellmates. Id.
at 59-60. The Prison gave inmates an unlimited supply of small
bars of soap. Id. at 44-45, 95-96. Malles was told to use a new
bar of soap each day, and he did so. Id. at 96. Malles also
washed his hands in a sink in his cell before each meal and after
going to the bathroom. Id. at 43-44. The prison gave the inmates
separate tubs to hold their belongings, but no one told Malles
that he should take precautions to prevent infections. Id. at 60,
120. When Malles first noticed an irritation under his arm,
discussed below, he began to wash his own shirts in his cell,
though he would send the rest of his clothes and towels to the
laundry. Id. at 93. Until Malles left the Prison in December of
2006, he washed his own shirts with the soap that the prison gave
the inmates to wash their bodies.[11] Id. at 94-95.

The 1C2 unit where Malles was primarily housed had two
showers, but one of the showers did not work from the time he
arrived on the unit until around October 13, 2005, after Malles
returned from medical isolation. Id. at 63-64. During this time,
up to fourteen prisoners shared one shower on 1C2. Id. at 64. The

_____

[11] Malles characterized the soap as "[l]ittle, small,
smell-good soap that they were giving out." Malles Dep. at 95.

12

"pod man," an inmate who was housed on 1C2, was paid to clean the showers and other communal areas of the pod, and to do other work. Id. at 65-66. The pod man "always cleaned" the showers at 10:00 p.m., cleaned the tables after each meal, and mopped the floor in the common room. Id. at 67. Inmates could take showers until 10:00 p.m. when Prison staff shut down the showers so the pod man could clean them. Id. at 67-68. The inmates were "locked down" two other times during the day, and this gave the pod man the opportunity, never used, to clean the showers during those intervals.  Id. at 68. Malles did not clean the showers himself, and he was never in the showers when they were cleaned. Id. at 68-69.

### F.   Malles's MRSA Infection and Treatment

On September 9, 2005, Malles saw an unidentified inmate getting in the shower on 1C2 "who had large suspicious boils on his back." Id. at 106. Malles saw these sores through an opening in the shower curtain as that inmate took off his sweatshirt. Id. at 107. The man scratched his back against the wall of the shower, and Malles told the pod man about it. Id. at 108. The pod man reported this to the pod officer, and after the unidentified inmate finished his shower, he was called to the infirmary. Id.

The unidentified inmate found out that he had MRSA, came back to 1C2 to pack his belongings, and went into medical isolation. Id. at 108-109. The pod man put on a mask and gloves and cleaned the shower. Id. at 110. At some point, the pod man also became infected and spent seven days in isolation. Id. at 109-10. Defendants' own statistics regarding MRSA show that four people in Malles's unit, 1C2, had MRSA in the third quarter of 2005, and Bahnick did not know if there were any precautions taken or education given to the other inmates in that unit. Statistics at 7; Bahnick Dep. at 80-81.

Malles first noticed an itch under his right armpit on October 1, 2005. Malles Dep. at 69-70, 71-72. That morning, Malles mentioned it to the nurse who came after breakfast to deliver medications.[12] Id. at 69-70. This nurse was a substitute for the regular nurse. Id. at 76. He purposely took the last place in line and showed his sore to the nurse. Id. at 74. She told him that "it's probably just from the water" or the detergent. Id. at 71. That evening Malles also mentioned his concern to the regular night medications nurse, who came around

---

[12] At that time, Malles took Zantac and vitamins. Malles Dep. at 74. He also currently takes Gas-X and Tylenol for arthritis. Id. at 129.

9:30 or 9:45 p.m. Id. at 77. That nurse said that he did not "have any time" for him, and Malles "just left it alone." Id. at 78. The night nurse also told him to put in a sick call request. Malles asked him for a slip, but the nurse told Malles that he could not get one for him at that time and "just kept on trucking down the road." Id. at 78.

The next morning, Malles told a different substitute medication nurse that the developing bubbles were getting bigger and he also showed her the redness on his arm. Id. at 79-80. Like the substitute nurse the day before, she told him that the itching was probably caused by the water and that it would likely go away in a couple of days. Id. at 71, 79-80. He did not ask this nurse for a sick call slip "because [he] was getting frustrated at that particular time." Id. at 80. The same night nurse came each night from October 2 through 5, but Malles did not tell him about the rash because he thought that nurse would give him the same answer as the first night. Id. at 82, 87. He also did not mention his rash to the afternoon medication nurses. Id. at 82.

On the morning of October 3, Malles told yet another substitute nurse that his rash was worse. Id. at 83. She wrote down his name but told him that it was caused by the water and

15

not to worry about it. Id. Because the nurse wrote down his name, Malles thought that he would be called to the infirmary, but he was not. Id. He did not ask her for a sick call slip. Id. at 84. He told a fourth substitute nurse on the morning of October 4th that the rash was getting worse and "starting to come in like a bag, you know, hanging down." Id. Again, he was given the same response about the rash being caused by the water or laundry soap. Id. at 85. On the fifth morning, Malles saw one of the four substitute medication nurses again, and he told her that he was still itching. Id. at 86. She told him to put in a sick call slip, and he told her that he could not get a slip. Id. He asked her for a slip, but she said that she did not have any and so could not give him one.[13] Id. at 86.

On October 6, the regular morning medication nurse returned, and Malles showed her his arm and said that "two of the balls were busted already." Id. at 87-88. She gave him a sick call slip, which he filled out, and within two hours he was called to the infirmary. Id. at 88, 90. At the infirmary Malles took off his shirt, and the doctor's assistant looked at his arm. At that point, "she could see it all coming out," and all of the bubbles

---

[13] Malles did not ask anyone other than these nurses for a sick call slip. Malles Dep. at 92.

16

under Malles's arm were "busted." Id. at 89. The assistant took a sample from one of Malles's sores, placed it in a tube, put it in a plastic bag, and sent it to the lab.[14] Id. at 98. After that, Malles went back to his cell to pack his belongings before being placed in medical isolation. Id. at 98-99. An officer gave Malles rubber gloves to wear while he packed his belongings, and he also wore a mask. Id. at 99.

Malles was in medical isolation from October 6 to 13, 2005. Id. at 99. After he arrived there, seven other inmates in isolation told him that they had MRSA.[15] Id. at 100-101. On the second day in isolation, a nurse told Malles that he had MRSA, that it was "in [his] . . . blood system and the rest of [his] body for the rest of [his] life." Id. at 124. See also Malles Request to Staff, February 27, 2006 (stamped "received" on March 2, 2006), Lehigh County Ex. C ("I have been informed by PrimeCare Medical that the MRSA will remain in my blood for the rest of my

---

[14] Reports on Malles's infection confirm that medical staff collected the sample on October 6, 2005 and the lab received the sample that same day. The lab made its first report on October 10, 2005 and then apparently made additional reports to the prison on October 11 and 14, 2005. See BioReference Lab Reports.

[15] At the time of his deposition Malles did not know the names of these inmates. Malles Dep. at 102-103.

life."). Reports from BioReference Laboratories confirm that Malles had a "heavy growth of staphylococcus aureus" and that he was "positive for methicillin-resistant staph aureus." BioReference Lab Reports. The doctor called his infection a "staff infection" [sic],[16] not MRSA, and she advised Malles to wash his hands. Malles Dep. at 124.

During Malles's seven days in medical isolation, nurses saw him every day, washed the infected area on his arm, and put bandages on it. Id. at 104. He was initially given the antibiotic bactrim, and on October 14, 2005, he began taking tetracycline.[17] Bahnick Dep. at 51-52. He saw a doctor toward the end of this period, who told him that he "look[ed] pretty good now." Malles Dep. at 105. Bahnick said there were no complications with Malles's MRSA treatment, and his medical records show that his condition improved. Bahnick Dep. at 44-45. Malles has never been hospitalized for his rash and boils or MRSA. Malles Dep. at 112.

---

[16] It bears repeating that MRSA stands for "Methicillin Resistant Staphylococcus Aureus."

[17] According to the report from BioReference Laboratories, Malles's infection was sensitive to tetracycline. See BioReference Lab Report.

### G. **Malles's Purported Ongoing MRSA Infection**

Malles believes that he will have MRSA "for the rest of [his] life and [he] can break out at any time." Id. at 116. Bahnick said that a few people with MRSA "had recurrence." Bahnick Dep. at 45. Other than Malles's hearsay testimony regarding what unidentified medical personnel told him, however, there is no evidence in the record that a medical professional has examined Malles and made a determination regarding the status of his infection and whether it may recur.[18] Malles believes,

────────────────

[18] As an exhibit to its motion for summary judgment, Lehigh County submitted documents from Luther V. Rhodes, M.D., Chief of the Infectious Diseases Division and Chairman of Infection Control at Lehigh Valley Hospital. Allentown Infectious Diseases Services, Inc., Documents, Lehigh County Ex. D. Dr. Rhodes reviewed the complaint, Malles's prison medical records, the depositions of James Malles, medical personnel, and prison staff, and various discovery documents and responses to interrogatories. He made a "firm conclusion that the Lehigh County officials were not responsible for Mr. Malles acquiring MRSA skin infection." Id. at 1. Importantly, it appears that Dr. Rhodes has not personally examined Malles.

Dr. Rhodes noted that Malles had daily access to showers and that "[d]aily showering or bathing are perfectly appropriate skin hygienic measures to help prevent MRSA." Id. According to Dr. Rhodes, sanitizing shower stalls between each use is not required to control MRSA, "would not appear to be practical[,] and is certainly not the usual practice of hospitals in this country." Id. at 2. Dr. Rhodes concludes that Lehigh County performed the "key elements of a MRSA control program," which include implementing daily showers or bathing, and "proper diagnosis and treatment of MRSA skin infections." Id. He characterizes Malles's claims that he was infected from the

(continued...)

nonetheless, that he had another rash from MRSA while he was

incarcerated at Camp Hill.[19] Malles Dep. at 126. A doctor there

looked at an irritated area on his back and then told him "you

have MRSA, this doesn't mean that you're a carrier of it, that

you're the one that gave it out to anybody or anything like that

---

[18] (...continued)
shower water or that broken showers led to his infection as a
"specious argument [that is] not at all substantiated by the
medical facts." Id.

   Dr. Rhodes contends that MRSA is "treatable and
curable" and that Malles is "sadly uninformed" to think that it
is a permanent infection. Id.

   PrimeCare submitted an expert report from Arnold L.
Lentnek, M.D., who also reviewed some of Malles's medical records
and documents from this case, but did not examine Malles.
See Letter from Arnold L. Lentnek to Thomas E. Brenner (Apr. 8,
2008), PrimeCare Ex. F. Dr. Lentnek appears to have made a number
of errors regarding the dates on which events occurred. He
repeatedly reports, in contradiction to Malles's deposition and
his medical records, that events occurred in September of 2005
rather than October of 2005.

   Nonetheless, Dr. Lentnek accurately noted that there
was a five-day period between the appearance of Malles's symptoms
and the initiation of treatment for MRSA. Id. at 2. He reported
that "in the absence of evidence of severe systemic infection
('sepsis') such a delay i[s] not inappropriate and, in fact, many
minor skin infections . . . will resolve spontaneously over this
period." Id. In a follow-up letter to plaintiff's counsel, Dr.
Lentnek also stated that there is no evidence in Malles's
deposition or his medical records that he had a systemic
infection. Letter from Arnold L. Lentnek to Jennifer L. Mundy
(Sept. 25, 2008), PrimeCare Ex. F at 1.

   Plaintiff submitted no expert report.

 [19] Malles said his only MRSA outbreaks were at Lehigh
County and Camp Hill. Malles Dep. at 130.

. . . ." <u>Id.</u> at 127. This doctor informed Malles that he could be

a carrier of MRSA "at that particular stage of it." <u>Id.</u> at 130.

Malles took some pills that the Camp Hill doctor gave him, and

the itching eventually subsided. <u>Id.</u> at 128. He has also gotten

bumps on his neck and head, but at the time of his deposition he

did not know whether or not that was related to MRSA. <u>Id.</u> at 132.

## II.  <u>Analysis</u>[20]

---

[20] Summary judgment is appropriate if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  <u>Liberty Lobby</u>, 477 U.S. at 255.
     The moving party bears the initial burden of proving
that there is no genuine issue of material fact in dispute.
<u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S.
574, 585 n.10 (1986). Once the moving party carries this burden,
the nonmoving party must "come forward with 'specific facts
showing there is a genuine issue for trial.'" <u>Matsushita</u>, 475
U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving
party must present something more than mere allegations, general
denials, vague statements, or suspicions.  <u>Trap Rock Indus., Inc.
v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins.
Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982).  It
is not enough to discredit the moving party's evidence, the non-
moving party is required to "present <u>affirmative</u> evidence in
order to defeat a properly supported motion for summary
judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original).
                                        (continued...)

To sustain a claim under § 1983, Malles must show "the violation of a right secured by the Constitution and laws of the United States" and "that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). According to the teaching of Monell v. Department of Social Services, 436 U.S. 658 (1978), Lehigh County "can be sued directly under § 1983 . . . [when] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [Lehigh County's] officers" or where the constitutional deprivations occurred pursuant to governmental custom. Monell, 436 U.S. at 690. Because PrimeCare contracted to provide medical care to inmates at the Prison, the same standards apply. See West, 487 U.S. at 56.

It has long been established that "deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment and "states a cause of action under § 1983." Estelle v.

---

[20] (...continued)
A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Gamble, 429 U.S. 97, 105 (1976). There is a two-prong test for such a claim.  Malles must show that (1) the prison officials were deliberately indifferent and (2) his medical needs were serious. West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978). To survive summary judgment, Malles must also produce sufficient evidence that defendants' actions were the proximate cause of his injuries. Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997); Best v. Essex County, 986 F.2d 54, 56 (3d Cir. 1993).

Negligence in diagnosis or treatment and disagreements about medical judgment will not suffice to establish constitutional violations. Estelle, 429 U.S. at 106; White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). And "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

### A.   Delay or Denial of Treatment Claim

Malles claims that the defendants violated the Eighth Amendment by delaying treatment of his MRSA-related rash for five days. Denial or delay of medical treatment is serious when it results in "unnecessary and wanton infliction of pain" or "where denial or delay causes an inmate to suffer a life-long handicap

23

or permanent loss." <u>Monmouth County Corr. Inst. Inmates v.</u>

<u>Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (quotations omitted).

As will be seen, <u>Keller v. County of Bucks</u>, 209 Fed. Appx.

201 (3d Cir. 2006), will be a focus of our inquiry here.  In

<u>Keller</u>, our Court of Appeals upheld a jury verdict in a § 1983

lawsuit that two pretrial detainees brought against Bucks County,

prison officials, and prison personnel after they contracted MRSA

during their detention and were subsequently hospitalized.[21]

One plaintiff in <u>Keller</u> received ineffective treatment for

MRSA.  At one point -- <u>after</u> the prison medical staff had

diagnosed him with an infection and given him antibiotics

(including one to which he had an allergic reaction) -- his

condition worsened and his infected sore began to discharge. In

response, a nurse only gave him Tylenol. <u>Id.</u> at 204. The next

day, this inmate was taken to the hospital where he underwent

multiple surgeries. <u>Id.</u>

---

[21] To be sure, <u>Keller</u> was at a different procedural
posture than Malles's case.  <u>Keller</u> involved the Fourteenth
Amendment rights of pretrial detainees, rather than the Eighth
Amendment rights of prisoners like Malles. We find the case
instructive, however, as pre-trial detainees' Fourteenth
Amendment rights are "analogous" to prisoners' Eighth Amendment
rights. <u>Keller</u>, 209 Fed. Appx. at 203 (internal quotations
omitted).

The other plaintiff in Keller attempted to see someone many times about a rash, but had difficulty seeing medical staff. He eventually developed a "scrotal infection" and was taken to the hospital to be treated after he spent thirty-six hours in restricted housing. Id. at 204. When the second plaintiff returned to the prison, his scrotal support device was taken away and the prison denied him bandages for his wound. Id. See also Young v. Kazmerski, 266 Fed. Appx. 191, 193-94 (3d Cir. 2008) (holding that the record supported an inmate's claim that he had a serious medical need when the prison knew that the inmate could not sleep and had trouble eating because his six remaining teeth were cutting into his gums, but the prison waited eleven months to provide dentures to the inmate); Lee v. Sewell, 159 Fed. Appx. 419, 421 (holding that a prisoner stated a claim of deliberate indifference when a doctor made him wait a year for medication for Hepatitis C and a nurse also made him wait for four months and then told him she could do nothing for him).

By contrast with Keller, our Court of Appeals found no deliberate indifference when prison medical staff monitored and treated a prisoner's hernia over the course of nearly a year, recommended surgery when his condition worsened, and the inmate eventually fully recovered. Williams v. Sebek, 299 Fed. Appx.

104, 106-107 (3d Cir. 2008). And in <u>Ayala v. Terhune</u>, 195 Fed.
Appx. 87 (3d Cir. 2006), our Court of Appeals held that there was
no deliberate indifference when a prisoner suffered occasional
delays of up to four days in receiving prescription medicine, did
not have an adequate supply of colostomy bags, and was forced to
keep used colostomy bags in his cell. 195 Fed. Appx. at 90-91. In
<u>Ayala</u>, our Court of Appeals noted that the plaintiff got "regular
medical care" and concluded that the "sporadic delays" in
receiving medication did not rise to the level of deliberate
indifference. <u>Id.</u> at 91. With regard to the provision of
colostomy bags, the Court concluded that the occasional failure
to provide the bags did not constitute a "pattern of deprivation
that rises to the level of deliberate indifference." <u>Id.</u>

    In its motion for summary judgment, PrimeCare argues that we
should dismiss Malles's Eighth Amendment claim regarding denial
of treatment because there was no material delay in treatment.
Malles claims that his "medical treatment was inexcusably delayed
for five days."[22]  Malles Brief in Opposition to PrimeCare Mot.
at 1. We are dubious that a five-day delay here would violate the

---

[22] Malles makes no claims regarding the adequacy of his
medical treatment once he was taken to the infirmary, so we will
not discuss his care after October 6, 2005.

Eighth Amendment, especially since there is no evidence that
Malles experienced heightened levels of pain or that the delay
itself caused any permanent harm. But we need not decide that
issue because nurses in fact saw Malles's rash and sores every
day from the first day of itching, October 1, 2005, to the day he
was placed in medical isolation, October 6.[23] Every morning the
nurses gave Malles advice regarding the cause of his skin
irritation and told him that it was not serious and would go
away.[24] See Malles Brief in Opposition to PrimeCare Mot. at 8-9.

Malles also complains that he had difficulty accessing sick
call slips, but his access to the slips is of no moment in this
case because on every day during the five days he in fact saw
nurses, showed them his rash, and received an opinion from them
regarding his symptoms.[25] Viewing these facts in the light most

---

[23] Although Malles argues that he was denied access to
medical care, he acknowledges that some of the nurses "did not
ignore his complaints" and gave him advice about the cause and
nature of the skin irritation. Malles Brief in Opposition to
PrimeCare Mot. at 8-9.

[24] Malles contends that these nurses were "untrained
and/or unsupervised," but there is no evidence of record
regarding the nurses' identity, much less regarding their
training and supervision. Malles Brief in Opposition to Lehigh
County Mot. at 3.

[25] To be sure, the nurses he saw each day were there to
(continued...)

27

favorable to Malles, these examinations were (perhaps)
perfunctory, and the nurses failed to recognize Malles's MRSA for
five days. But at worst such behavior amounts to negligence, not
deliberate indifference.

Malles relies on our Court of Appeals's decision in <u>Keller</u>,
but Malles's case differs from <u>Keller</u> in crucial ways. Unlike the
plaintiffs in <u>Keller</u>, Malles has not experienced serious
complications from MRSA or the treatment the prisons gave him. He
has not undergone surgeries as a result of the defendants'
behavior, nor does he claim that <u>after</u> his MRSA diagnosis the
prison failed properly to treat him (as the nurse did when she
gave Tylenol to the infected plaintiff in <u>Keller</u>).[26]

---

[25] (...continued)
dispense medications to inmates and not to treat patients. Malles
argues that this evidences a policy or practice to prevent the
medication dispensing nurses from communicating with inmates
regarding their medical conditions. But the facts of this case
deviate from the policies: the medication nurses in fact looked
at Malles's arm area daily and gave him their opinions about his
malady.

[26] Judge Fullam in <u>Keller</u> concluded that the defendants
"did nothing to provide medical treatment to Plaintiffs until the
last possible moment" and that the "prison simply ignored their
conditions." <u>Keller v. County of Bucks</u>, 2005 WL 675831 at *1
(E.D. Pa. Mar. 22, 2005), <u>aff'd</u>, 209 Fed. Appx. 201 (3d Cir.
2006).

Malles's case is closer to <u>Williams</u> and <u>Ayala</u>. He received regular medical care in the form of <u>daily</u> consultations with nurses (brief though they may have been), and there is no evidence to support a claim that any of the defendants were deliberately indifferent to his condition. Rather, Malles disagrees with the nurses' conclusions regarding his condition and argues that the Prison should not have taken five days to recognize his rash or boils as MRSA and begin treatment. Again, this behavior may have been negligent, but it does not amount to a constitutionally cognizable delay or denial of treatment. We will thus dismiss Malles's § 1983 claims as they relate to these issues.

### B.   <u>Prison Conditions Claim</u>

Malles also claims that the defendants were deliberately indifferent to the risk that he would contract MRSA in the prison by failing to (1) quarantine infected inmates, (2) properly clean and maintain the shower facilities, (3) warn inmates about MRSA and educate them about prevention, and (4) generally take more precautions against the spread of MRSA. Malles complains that PrimeCare and Lehigh County knew that the rate of MRSA infection was increasing, yet they did not change any policies to protect

inmates from infection. Defendants contend that we should dismiss these claims because (1) these purported failures do not rise to the level of deliberate indifference and (2) Malles has not produced any evidence of a causal link to establish liability under Monell.

Conditions of confinement constitute cruel and unusual punishment when they "deprive inmates of the minimal civilized measure of life's necessities" according to "the contemporary standard of decency." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). To prevail on his failure-to-protect claims, Malles must show "that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (internal quotations omitted).

There is no dispute that the defendants knew that MRSA was a serious health issue and failed, at least while Malles was at the Prison, to fully execute their own plans to more aggressively prevent the spread of this disease.  But Malles does not have a constitutional right to make PrimeCare and Lehigh County achieve their own goals for preventing MRSA, nor does he have a right for

30

the defendants to take all possible measures to prevent MRSA transmission. He only has a right to prison conditions that meet the relatively low bar of the Eighth Amendment. Certainly, defendants <u>may</u> provide inmates with conditions that exceed the constitutional requirements. But they are not <u>required</u> to do that simply because they made a plan to do so.

The proper measure for Malles's § 1983 claim is whether the conditions of the Prison met Eighth Amendment standards. <u>Keller</u> is again instructive. The <u>Keller</u> plaintiffs won a jury verdict on their claim that "offensive conditions at the prison created unconstitutional conditions of confinement." 209 Fed. Appx. at 206. Those conditions included: "filthy water pooled in the showers, water seeped into the cells, clean laundry was not always readily available, the mattresses were stained, and mildew grew on walls covered in peeling paint." <u>Id.</u> The inmates were also double-celled. <u>Id.</u> Our Court of Appeals upheld the jury verdict on the conditions of confinement claim <u>but</u> "note[d] that the facts alleged [in <u>Keller</u>] barely fulfill the minimum requirements of a conditions of confinement claim, and caution[ed] that situations of even slightly lesser magnitude would likely be an abuse of discretion as a result of improper application of law to fact." <u>Id.</u> at 207. The Court in <u>Keller</u> also

opined that even if "conditions were less than optimal,"
prisoners are not "deprived . . . of the minimal civilized
measures of life's necessities merely because they became ill."[27]
Id. at 206.

It bears stress that the facts in the Third Circuit's Keller
opinion were "barely" enough to "reveal widespread deprivation of
the 'minimal civilized measures of life's necessities.'" Keller,
209 Fed. Appx. at 205 (quoting Rhodes v. Chapman, 452 U.S. 337,
347 (1981)). Because the conditions at Lehigh County Prison
during Malles's tenure were not as unhygienic as those in Keller,

---

[27] When Judge Fullam in Keller discussed the
plaintiffs' conditions of confinement claims, he stated that
there was a sufficient basis for the jury to conclude that the
defendants "through deliberate indifference allowed conditions in
the facility that were likely to cause disease, injury or
suffering." Keller, 2005 WL 675831 at *1. He also stated that the
jury could have concluded that the defendants "knew of the MRSA
infection spreading throughout the prison and failed to take
necessary steps to minimize the number of inmates affected, for
example by keeping the showers and food handling areas in a
sanitary condition and instructing inmates on how to avoid the
spread of infectious diseases." Id. But our Court of Appeals in
Keller focused not on the prison's failure to prevent the
plaintiffs from becoming ill, but rather on the generally
unsanitary conditions present. We thus do not read the Third
Circuit's Keller opinion as requiring that prisons do anything
specific to prevent the spread of MRSA or other infectious
diseases.

we conclude that the conditions in this case do not rise to the level of a constitutional violation.[28]

A recent prison MRSA case from the Western District of Pennsylvania, though not binding on us, fortifies our analysis. In Gallo v. Washington County, No. 08-cv-0504, 2009 WL 274500 (W.D. Pa. Feb. 4, 2009), the plaintiff contracted MRSA while jailed at Washington County Prison. He filed his § 1983 suit against the prison, its Warden, and a prison nurse and claimed that they "failed to implement and enforce policies to protect plaintiff from MRSA, while utilizing policies and customs that placed plaintiff (and others) at risk of infection." Id. at *1. Gallo contracted MRSA after he was placed in a cell that had just

---

[28] Puzzlingly, plaintiff cites Yudenko v. Guarini, No. 06-4161, 2008 WL 4055826 (E.D. Pa. Aug. 27, 2008), as support for his proposition that "courts in this district have recognized that an inmate who contracts MRSA may have a viable cause of action under Section 1983 where the prisoner establishes that his contraction of MRSA was as a result of the county's policy, practice or custom." Malles Brief Opp. to Lehigh County Mot. at 17. We know from Keller that this is possible, though again the facts in that case are quite different from those in Malles's. In Yudenko, however, Judge Stengel did not go as far as Malles claims: he only recognized that inmates' § 1983 cases "typically involve . . . infectious disease," among other things. Yudenko, 2008 WL 4055826 at *6. Moreover, at this point in his analysis, Judge Stengel in Yudenko cited Oliver v. Bucks County, 181 Fed. Appx. 287 (3d Cir. 2006), in which our Court of Appeals upheld a grant of summary judgment for defendants on the plaintiff's MRSA claims.

been vacated by an infected inmate. Contrary to prison policy, the corrections officer refused to allow Gallo to clean and disinfect his new cell for a few days. Id. at *3. Five days after arriving in his new cell, Gallo complained about a sore on his arm and he was evaluated for MRSA two days later. Id. Gallo tested positive for MRSA, and the prison demanded that he shower after all of the other inmates were done and disinfect the shower after his use. Id.

Several weeks later, Gallo had a pain in his leg, but his request for medical care was denied. Medical staff examined Gallo three days later, moved him to the prison clinic, and gave him Motrin -- but they did not test him for a recurring or new MRSA infection. Id. at *4. He was in the prison clinic for a week, during which time prison staff observed, but did not examine him, every day. Id. Finally, he was transferred to the emergency room, where he was again diagnosed with MRSA. Gallo "underwent a series of surgeries to remove the infection and to plant antibiotic beads in his femur." Id. Although the Warden knew about MRSA, the prison had no general infectious disease policies, much less any policies specifically targeted at MRSA. Id. The inmate handbook blamed any infections or rashes on the inmates' failure to exercise good hygiene. Id. at *5.

34

Gallo concluded that the plaintiff failed to produce evidence to show that the defendants were deliberately indifferent because there was no evidence that (1) the corrections officer knew that the former inhabitant of Gallo's cell had MRSA or (2) medical staff knew that a new inmate was being transferred to that cell. Id. at *8. The court also held that prison officials were not deliberately indifferent to the MRSA risk, even though they knew about MRSA and yet neither educated themselves about the infection nor created policies to prevent its spread. Id.

Measured against Gallo's holding where the defendants did nothing to stop the spread of MRSA, the defendants in Malles's case cannot be regarded as deliberately indifferent. The Prison and PrimeCare engaged in some efforts to stop the spread of the infection, even if they did not do everything they could or planned to do.

Defendants also argue that there is no evidence that their actions (or inactions) were a proximate cause of Malles's injuries. There is indeed no evidence that more rigorous cleaning or any other measures would -- or could -- have prevented or reduced the likelihood of infection. Because the conditions at the Prison, as compared to those in Keller, do not rise to the

35

level of a constitutional violation, and because Malles has presented no evidence of causation, we will dismiss Malles's § 1983 claim with regard to the conditions of the prison and defendants' alleged failure to protect him from becoming infected with MRSA. See Tallman v. Barnegat Bd. of Educ., 43 Fed. Appx. 490, 498-499 (3d Cir. 2002) ("Although the question of proximate cause must often be submitted to the trier of fact, summary judgment is proper if the record cannot reasonably support a finding of proximate cause, and in prior § 1983 cases, we have upheld summary judgment on this basis.").

## III. Conclusion

Malles has not produced evidence to support his claims that the delay in treatment -- such as it was -- or conditions of confinement rise to the level of cruel and unusual punishment and therefore constitute Eighth Amendment violations. At worst, Malles alleges that defendants were negligent in their diagnosis and treatment of his MRSA infection, which will not suffice to support a claim under § 1983. Malles has also failed to produce evidence to support his contention that defendants were deliberately indifferent to a substantial risk of serious harm regarding his infection with MRSA.

We will therefore grant defendants' motions for summary judgment as to Malles's § 1983 claims. The only remaining claim is that against PrimeCare for negligence under state law. As there are no federal law claims remaining in the case, we decline to exercise supplemental jurisdiction over the remaining state law claim pursuant to 28 U.S.C. § 1367(c)(3), and we will dismiss that claim without prejudice.[29]


BY THE COURT:

\_\_\s\Stewart Dalzell

---

[29] We thank Morgan, Lewis & Bockius, LLP, especially Eric Kraeutler, Richard J. DeFortuna, Jamie Kohen, and Seth Ptasiewicz, Esqs., for their pro bono representation of the plaintiff in this fact-intensive matter.